FILED

Aug 19   3 23 PH '05

U.S. D I
EASTE

BY _____ DEP. CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT GREENEVILLE

**ANDREW ARMBRISTER, and MELISSA** )
**ARMBRISTER, on behalf of themselves** )
**and all others similarly situated,** )
)
          **Plaintiffs,** )
)
**v.** )
)
**INTEL CORPORATION,** )
)
          **Defendant.** )

NO. 2:05-CV-212

JUDGE: _____
MAGISTRATE: Inman

**CLASS ACTION**

---

## CLASS ACTION COMPLAINT

---

**NOW INTO COURT** come the Plaintiffs, Andrew and Melissa Armbrister, and file this Class Action Complaint on behalf of themselves and all others similarly situated in the States of Alabama, Arizona, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Carolina, South Dakota, Tennessee, Vermont, West Virginia, Wisconsin and the District of Columbia (the "Class Jurisdictions"), who purchased products containing and/or using Intel microprocessors indirectly from Defendant, its predecessors, or its controlled subsidiaries and affiliates from at least July 12, 2001 to the present ("Class Period").

This Complaint is alleged upon information and belief, except as to those allegations which pertain to the named Plaintiffs, which are alleged on their personal knowledge.

## I.   NATURE OF ACTION

1.      This action concerns Intel's anti-competitive and monopolistic practices intended to prevent and destroy competition and acquire and/or maintain monopoly power and raise prices to supra-competitive levels in the market for microprocessors that run the Microsoft Windows and Linux families of operating systems ("the x86 Microprocessor Market").

2.      Intel dominates the x86 Microprocessor Market, with greater than an 80 percent market share as measured by unit volume, and greater than a 90 percent market share as measured by revenue. Intel acquired and maintains its monopolistic presence in the x86 Microprocessor Market through series of anti-competitive acts that were designed to, and did, eliminate competition and prevent entry in said market.

3.      Intel has used, and continues to use its monopoly power to injure consumers by charging supra-competitive prices for its microprocessors. These artificially inflated prices are passed on to consumers and end-users in the form of inflated personal computer prices and the loss of freedom to purchase computer products that best fit their needs.

4.      Intel's intentional stifling of a fair marketplace further reduces the pace and quality of innovation, which in turn negatively effects the economic and non-economic well being of those citizens in the Class Jurisdiction.

5.      Plaintiffs, on their own behalf, and on behalf of the Class defined below, seek to recover for the injuries resulting from their overpayments for Intel microprocessors. Plaintiffs also seek injunctive and declaratory relief, and costs, including reasonable attorneys' fees.

6.      Plaintiffs bring this action on behalf of themselves and all others similarly situated

in the following states under the references statutes: Alabama [Ala. Code §§ 8-19-1, *et seq.* (consumer protection) and Ala. Code §§ 6-5-60, *et seq.* (antitrust)]; Arizona [Ariz. Rev. Stat. §§ 44-1401, *et seq.* (antitrust)]; Florida [Fla. Stat. Ann. §§ 501.204(1), *et seq.* (consumer protection)]; Hawaii [Hawaii Rev. Stat. §§ 480-1, *et seq.* (antitrust)]; Iowa [Iowa Code Ch. 553, §§ 553.1, *et seq.* (antitrust)]; Kansas [Kan. Stat. Ann. §§ 50-101, *et seq.* and §§ 50-801 (antitrust) and Kan. Stat. Ann. §§ 50-601, *et seq.* (consumer protection)]; Maine [Me. Rev. Stat. Ann. tit. 10, §§ 1101 and 1104 (antitrust), Me. Rev. Stat. Ann. tit. 5, §§ 207 and 209 (consumer protection)]; Massachusetts [Mass. Gen. L. c. 93A (consumer protection)]; Michigan [Mich. Comp. Laws Ann. §§ 445.771, *et seq.* (antitrust) and Mich. Stat. Ann. §§ 445.901, *et seq.* (consumer protection)]; Minnesota [Minn. Stat. Ann. §§ 325D.49-325D.66 (antitrust) and Minn. Stat. Ann. §§ 325D.43-325D.48 (consumer protection)]; Mississippi [Miss. Code Ann. §§ 75-24-1, *et seq.* (antitrust)]; Nebraska [Nebraska Rev. Stat. §§ 59-801 *et seq* (antitrust) and Nebraska Rev. Stat. §§ 59-1601 *et seq* (consumer protection)]; Nevada [Nev. Rev. Stat. Chapter 598A.010, *et seq.*]; New Mexico [N.M. Stat. Ann. §§ 57-1-3 (antitrust) and N.M. Stat. Ann. '57-12-3 (consumer protection)]; New York [N.Y. Gen. Bus. Law §§ 340 *et seq.*]; North Carolina [N.C. Gen. Stat. §§ 75-1, 75-1.1, 75-2 (antitrust)]; North Dakota [N.D. Cent. Code §§ 51-08.1, *et seq.* (antitrust) and N.D. Cent. Code §§ 51-15-01, *et seq.* (consumer protection)]; South Carolina [S.C. Code Ann. §§ 39-3-10 (antitrust)]; South Dakota [S.D. Codified Laws Ann. §§ 37-1-14.3, 37-1-33 (antitrust), S.D. Codified Laws Ann. §§ 37-26-6 (consumer protection)]; Tennessee: [Tenn. Code Ann. §§ 47-25-101 *et seq.* (antitrust) and Tenn. Code Ann. §§ 47-18-101 *et seq.* (consumer protection)]; Vermont [Section 2451, *et seq.* and section 2465 of Vt. Stat. Ann., tit. 9 (consumer protection)]; West Virginia [W. Va. Code §§ 47-18-1, *et seq.* (antitrust) and W. Va.

-3-

Code §§ 46A-6-101, *et seq.* (consumer protection)]; Wisconsin [Wis. Stat. Ann. §§ 133.04, 133.16 & 133.18 (antitrust) and Wis. Stat. Ann. §§ 100.20 (consumer protection)]; and the District of Columbia [D.C. Code. Ann. §§ 28-4501, *et seq.* (antitrust) and D.C. Code Ann. §§ 28-3901, *et seq.* (consumer protection)] (the "Class Jurisdictions"). Plaintiffs request that the foregoing laws of each of the aforementioned states be applied in this case.

## II.  JURISDICTION AND VENUE

7.      This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which, *inter alia*, amends 28 U.S.C. §1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs. *See* 28 U.S.C. 1332(d)(2) and (6). This Court also has jurisdiction under 28 U.S.C. §1332(d) because "one or more members of the class is a citizen of a state within the United States and one or more of the Defendants is a citizen or subject of a foreign state." The Court also has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of the Court and Defendant systematically and continually conducts business here and throughout the United States, including marketing, advertising, and sales directed to residents of every Class Jurisdiction.

8.      Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (c) because Defendant as a corporation is "deemed to reside in any judicial district in which [it is] subject to personal jurisdiction."

-4-

## III. PARTIES

9.     Plaintiffs Melissa and Andrew Armbrister are residents of Greeneville, TN.

During the relevant time period, Plaintiffs Melissa and Andrew Armbrister purchased two Dell

computers that contained an Intel microprocessor.

10.     Defendant Intel Corporation is a Delaware corporation with its principal place of

business in Santa Clara, California. It conducts business both directly and through wholly-owned

and dominated subsidiaries worldwide. Intel and its subsidiaries design, produce, and sell a wide

variety of microprocessors, flash memory devices, and silicon-based products for use in the computer

and communications industries.

## IV. CLASS ACTION ALLEGATIONS

11.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of themselves and the following Class:

> All persons and business entities in the States Alabama, Arizona,
> Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan,
> Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York,
> North Carolina, North Dakota, South Carolina, South Dakota,
> Tennessee, Vermont, West Virginia, Wisconsin and the District of
> Columbia who indirectly purchased products containing and /or using
> Intel microprocessors in Tennessee and the Class Jurisdictions from at
> least July 12, 2001 through the present.

> Excluded from the Class are Defendant; entities in which Defendant
> has a controlling interest; Defendant's employees, officers, or
> directors; Defendant's legal representatives, successors, or assigns;
> judicial officers who may hear the case or related persons; and jurors
> or related persons.

12.     The requirements of Rules 23(a), 23(b) (1), 23(b) (2), and 23(b) (3) of the Federal

Rules of Civil Procedure have been met in that:

**(A) Numerosity.**  Plaintiffs do not know the exact size of the Class, since such information is in the exclusive control of the Defendant. The exact number of class members may be determined by appropriate discovery. Based on the nature of the commerce involved, however, Plaintiffs believe that the class members are in hundreds thousands or millions and that members of the class are so numerous and so geographically dispersed throughout the Class Jurisdictions so that joinder of all members would be impracticable.

**(B) Typicality.**  Plaintiffs' claims are typical of other class members' claims because each consumer has been injured through the uniform misrepresentations and omissions described herein and have paid supra-competitive prices for products containing and/or using Intel microprocessors without having been informed that they were paying illegal and improper prices. Accordingly, by proving their own claims, Plaintiffs will presumptively prove the claims of all class members.

**(C) Commonality.**  Virtually all of the issues of law and fact in this class action are common to each class member and include at least the following:

- (i) Whether Defendant engaged in the conduct alleged herein;

- (ii) Whether there is statutory authority for Defendant's actions as alleged herein;

- (iii) Whether Defendant's actions as alleged herein are in violation of Tennessee and the Class Jurisdictions' statutory and/or common laws;

- (iv) Whether Defendant acted without statutory authority in committing the acts alleged herein;

- (v) Whether Plaintiffs and class members have sustained damages and what is the proper measure of damages;

- (vi) Whether it is appropriate to enjoin further transactions of this nature; and

- (vii) Whether damages should be trebled in accordance with the provisions of Tennessee and the Class Jurisdictions' laws, where applicable.

**(D) Adequacy of Representation.** Plaintiffs can and will fairly and adequately represent and protect the interests of the class and have no interest that conflicts with or is antagonistic to the interests of class members. Plaintiffs have retained attorneys who are experienced and competent in complex class action and consumer litigation.

13.     Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because a class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted herein given that:

> (a)     Common questions of law and fact overwhelmingly predominate over any individual questions that may arise and consequently, there would be enormous economies to the courts and to the parties in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;

> (b)     The size of each class member's individual damage claim is too small to make individual litigation an economically viable alternative, such that few class members have any interest in individually controlling the prosecution of separate actions;

> (c)     Class treatment is required for optimal deterrence and compensation and for limiting the court-awarded reasonable legal expenses incurred by class members;

> (d)     Despite the relatively small size of each individual class member's claim, the aggregate volume of said claims, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost effective basis, especially when compared with repetitive individual litigation; and no unusual difficulties are likely to be encountered in the management of this class action in that all questions of law or fact to be litigated at the liability phase are common to the class.

14.     Class certification is appropriate under Rule 23(b) (2) of the Federal Rules of Civil Procedure because Defendant has acted on grounds generally applicable to the class.

15.     Class certification is also appropriate pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure because prosecution of separate actions would create a risk of adjudication with

-7-

respect to individual class members which may, as a practical matter, be dispositive of the interests of other members not parties to the adjudication or which may substantially impair or impede their ability to protect their interests.

16.     Plaintiffs' claims are typical of the class members' claims because Defendant injured Plaintiffs and the class members in the same manner (i.e., Plaintiffs and class members were forced to pay supra-competitive prices for products containing Intel microprocessors).

17.     Separate actions prosecuted by individual class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant.

## V.  INTEL'S MONOPOLY POWER IN THE RELEVANT MARKET

### A.     The Relevant Product Market

18.     The relevant product market is the x86 Microprocessor Market.

19.     A microprocessor, also called a microchip or chip, is an integrated circuit that contains the entire central processing unit for a computer. Original equipment manufacturers ("OEMs") use these microprocessors to power the computers that ultimately are purchased by consumers.

20.     Although other microprocessors, besides x86 microprocessors, are offered for sale, these other microprocessors are not reasonably interchangeable with x86 microprocessors because none can **run** the x86 Windows or Linux operating systems or the application software written for them.

21.     A putative monopolist in the x86 Microprocessor Market would be able to raise the prices of x86 microprocessors above a competitive level without losing so many customers to other

-8-

microprocessors as to make this increase unprofitable. While existing end-users can theoretically shift to other operating system platforms, high switching costs associated with replacing existing hardware and software make this impractical. Further, the number of new, first-time users who could choose a different operating system platform is too small to prevent **an** x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time. Computer manufacturers would also encounter high switching costs in moving from x86 microprocessors to other architectures, and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

## B.    The Relevant Geographic Market

22.    The relevant geographic market is worldwide. Indeed, in its July 1998 Answer to a complaint by the Federal Trade Commission, Intel admitted that the relevant geographic market was the world.

23.    Intel and its competitors in the x86 Microprocessor Market compete globally. Platform architecture is the same from country to country; microprocessors can be easily and inexpensively shipped around the world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another.

## C.    Intel's Monopoly Power in the Relevant Market

24.    Intel dominates the worldwide x86 Microprocessor Market. According to published reports, over the last several years it has consistently achieved more than a 90 percent market share as measured by revenue. In seven of the last eight years, Intel has captured at least 80 percent of x86 microprocessor unit sales.

-9-

25.     Intel's only meaningful competitor in this market is Advanced Micro Devices, Inc. ("AMD"). AMD's revenue share has remained at approximately 9 percent, while its worldwide volume share has hovered around 15 percent, only once penetrating the 20 percent level.

26.     Another competitor, Cyrix, was acquired by National Semiconductor in 1997, and exited the market two years later. As of the beginning of 2005, only two other x86 chipmakers remained — Via Technologies, Inc. and Transmeta Corporation. Transmeta has since announced its intention to cease selling x86 microprocessors, and Via has a less than 2 percent market share.

27.     Intel is shielded from new competition by huge barriers to entry. A chip fabrication plant capable of efficiently mass-producing x86 microprocessors costs at least $2.5 billion. In addition, billions of dollars in research and development costs would be required to design a competing x86 microprocessor and to overcome almost insurmountable intellectual property and knowledge barriers.

28.     Intel has reaped huge financial benefits from its monopoly position. Intel's revenue from microprocessor sales alone exceeded $24 billion in 2004. In 2003 and 2004, operating margins for the Intel Architecture business, which develops and sells microprocessors, were approximately 40 percent.

## D.     Distribution in the Relevant Market

29.     Annual worldwide consumption of x86 microprocessors currently stands at just over 200 million units per year and is expected to grow by 50 percent over the remainder of the decade. Relatively few microprocessors are sold for server and workstation applications (8.75 million in 2004), but these command the highest prices. Most x86 microprocessors are used in desktop personal computers ("PCs") and mobile PCs, with desktops currently outnumbering mobiles by a margin of

-10-

three to one. Of the total worldwide production of computers powered by x86 microprocessors, 32 percent are sold to United States consumers.

30. The majority of x86 microprocessors are sold to a handful of large OEMs, highly visible companies recognized throughout the world as the leading computer makers. Nine OEMs — regarded in the industry as "Tier One"— together account for almost 80 percent of servers and workstations, over 40 percent of desktop PCs, and over 80 percent of mobile PCs. These "Tier One" OEMs are Hewlett-Packard, which now also owns Compaq Computer; Dell; IBM, which sold its PC business to Lenovo as of May 1,2005; Gateway/eMachines; and Fujitsu/Fujitsu Siemens. Toshiba, Acer, NEC, and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market. The Tier One OEMs operate on small or negative profit margins.

31. The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers, and other, smaller distributors.

32. OEMs sell computers through a variety of distribution channels, including through the internet, company-employed sales staffs, independent distributors, and retail chains. Microprocessor manufacturers compete not only to have OEMs incorporate their products into their retail platforms but also to convince retailers to allocate shelf space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

## VI. INTEL'S UNLAWFUL ANTI-COMPETITIVE ACTIVITIES

### A. Intel's Acquisition of Monopoly Power

33. In the early 1980s, IBM defined the original PC standards, choosing among a variety

-11-

of microprocessors, including those developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel, and ADM. IBM opted for the Intel architecture, which utilized what became known as the x86 instruction set (after Intel's naming convention for its processors, *i.e.,* 8086, 80186, 80286, 80386, etc.). IBM demanded, however, that Intel contract with another integrated circuit company and license it to manufacture 8086 chips as a second source. ADM agreed to abandon its own, competing architecture, and undertook to manufacture 8086 chips as a second source of supply.

34.     In February 1982, Intel and AMD entered into a ten-year agreement by which either company could elect to be a second source for products offered to it by the other. Under the contract, AMD could initially obtain second-source rights to Intel's 8086 chip and other specified products for cash; after 1985, AMD would have open access to Intel's product line if Intel accepted AMD products of sufficient value. AMD served as a second source to the successors to the 8086 chip: the 80186 and 80286.

35.     Beginning in mid-1984, Intel, which was anxious to be the sole source for its upcoming 32-bit chip — the 80386 — decided to frustrate the operation of the contract by taking no more products from AMD. Furthermore, Intel kept its decision secret from AMD and the public. As internal Intel documents state, Intel's objective was to "[a]ssure AMD they are our primary source through regular management conduct and formal meetings" in order to "[k]eep AMD in the Intel camp." A 1986 Intel memorandum articulated its strategy: "Maintain a second-source, business as usual posture in the marketplace. . . . Our strategy is to keep talking. . . We do not want [AMD] to go on to Hitachi or NEC, and should not stimulate them to do so."

36.     Intel's plan succeeded: for about two years, AMD continued to believe, incorrectly, that it would be permitted to second-source the 80386 microprocessor. As an arbitrator later found,

in a ruling that was confirmed by the California Supreme Court, "Intel to some extent lulled AMD into some sense of well-being about the continuation of the relationship and to some extent contributed to AMD's delay in reverse engineering the 80386."

**B.    Development of AME as a Threat to Intel's Monopoly**

37.    Intel's conduct in the 1980s gave it a significant head start over AMD in the x86 Microprocessor Market. Not until June 1999 did AMD unveil its first x86 chip without Intel pin-compatibility, the Athlon microprocessor. Significantly, Athlon was the first x86 microprocessor to run at a speed of 1 GHz, and outperformed Intel's Pentium III chip in benchmark tests.

38.    AMD's Athlon microprocessor consistently was recognized by the industry as a superior product. In 2000, Athlon captured the "triple crown" of computing accolades, winning the PC World Product of the Year award, the PC Magazine Technical Excellence prize for Best Component in Hardware Category, and the Maximum PC magazine CPU of the Year Award. By the end of 2001, Athlon had received more than 80 awards worldwide.

39.    In April 2003, AMD introduced the Opteron microprocessor, the world's first 64-bit x86 microprocessor for severs. Several months later, ADM released the Athlon 64 microprocessor, its 64-bit x86 microprocessor for desktops and notebooks. Importantly, and in contrast to Intel's Itanium microprocessor, AMD's new microprocessors were backward-compatible, meaning that they could accommodate 32-bit software as well as 64-bit programs.

40.    In November 2003, PC Magazine awarded the Athlon 64 and Opteron microprocessors its Award for Technical Excellence in the components category. The magazine wrote: "We tested the first 64-bit AMD Opteron processor in April 2003, and were we impressed! It screamed on our

-13-

server application performance tests. Six months later, the Athlon 64 arrived, and again we were amazed by the processor's stellar performance in off-the-shelf 32-bit gaming, content creation, and business applications." By the end of 2004, the Athlon 64 and Opteron micro

processors had won over 60 awards for innovation and performance.

41.    As Dell's CEO, Kevin Rollins, explained in February 2005, "[w]hen one of our partners slips on the economics or they slip in terms of the technology, that causes us great concern. For a while Intel admittedly slipped technologically and AMD had stepped forward, and we were seeing that in terms of customer response and requests."

42.    Notwithstanding AMD's technical achievements and generally lower prices, Intel continues to dominate the x86 Microprocessor Market. By means of Intel's anti-competitive conduct, AMD's market share has been constrained unlawfully. Among other things, this has prevented AMD from achieving minimum levels of efficient scale necessary to compete with Intel as a predominant supplier to major customers. As a result, consumers of x86 microprocessors are forced to pay supra-competitive prices, are limited in their choice of products, and are denied the benefits of innovative developments.

43.    *Infoworld* magazine analyzed the competitive landscape in its August 27, 2004 issue:

> AMD has become known as the company that kept Intel honest, the Linux of the semiconductor world. Competition from AMD has reversed the trend of rising prices and stagnant innovation that characterize a controlled market. AMD is responsible for $500 desktops, $1,200 rack servers, and multigigahertz mainstream microprocessors, despite the fact that most of them have Intel's logo on them.
>
> Today, AMD's pluck is paying off bigger than ever before. After decades of aping Intel architectures, the AMD 64 architecture, rooted

-14-

> in Opteron and Athlon 64 processors, has actually been imitated by Intel in the form of Nocona, Intel's 64-bit version of Xeon. In a stunning reversal of fortune, Intel was forced to build that chip because Opteron was invading a server market that the Intel Itanium was supposed to dominate.
>
> Suddenly, Intel is feeling a breeze where its pants used to be. But with Intel mad as hell and hot on AMJYs heels, can AMD grab enough sales traction to hold up to the punishing onslaught everyone knows is coming?

44. Rather than engage AMD in lawful competition, Intel has responded to AMD's threat to its monopoly position with a variety of anti-competitive practices directed at OEMs, distributors, and retailers, and involving industry standard-setting and other technical abuses. These anti-competitive practices are discussed below.

## C. Intel's Anti-competitive Practices Directed at OEMs

45. At least in the short term, most if not all of the major OEMs must engage significantly with Intel for several reasons. First, AMD is too small to service all of an OEM's needs while continuing to satisfy other customer demand. Second, to meet customer expectations, OEMs must assure commercial computer buyers that specifications, including the microprocessor, will remain unchanged during the product's life-cycle. Third, Intel has encouraged end-users to specify that microprocessors be of the same *family* among similar computers in one installation, as this is perceived to increase reliability (although technically this is not the case). Intel has exploited OEMs' need to engage significantly with Intel by directing a series of anti-competitive practices at OEMs designed to limit AMD's growth.

46. Through direct payments and other financial inducements, Intel has forced OEMs into exclusive and near-exclusive deals, thereby limiting AMD's ability to gain incremental market share.

-15-

In addition, Intel has bought limited exclusivity from OEMs in order to exclude AMD from the most

profitable lines or from channels of distribution best tailored to take advantage of AMD's

price/performance advantage over Intel. For example, Intel has largely foreclosed AMD from the

lucrative commercial desktop sector.

47.     An April 5, 1999 article in *PC Week* described the coercive effect of one such form

of payment, the "Intel Inside" program:

> The wildly successful program, which began broadly in 1994 as a way
> to create brand equity for the Pentium processor, has evolved into
> Intel's premier marketing vehicle, managed by an army of attorneys,
> accountants and administrators. Intel has deftly used the program to
> keep competitors at bay in the most profitable segment of its business:
> corporate PCs. That in turn, has left computer buyers with fewer
> options — and higher prices — when choosing business desktops,
> notebooks and PC servers. A look at the Intel Inside program
> requirements, which Intel keeps under tight wraps, shows how fully
> the chip maker controls the marketing purse strings of PC makers that
> sign on. Interviews with numerous current and former executives at
> Intel's largest OEM customers — all of whom declined to be
> identified, fearing reprisals from Intel — add fuel to the fire. These
> executives call the program addictive and claim their companies can't
> compete without it. . . .
>
> The marketing dollars are enough of a carrot to make PC vendors sign
> off on Intel's restrictive program requirements. Before PC makers are
> eligible for reimbursement they must sign an OEM Trademark License
> Agreement that regulates everything from logo size and color to
> branding. The eligible systems are added to a form called Attachment
> C, which Intel uses to keep track of qualifying Intel Inside products.
> OEMs must modify Attachment C every time they introduce a new
> Intel-based system. Once a PC maker meets all Attachment C
> guidelines, Intel reimburses 6 percent of the total average selling price
> of each vendor's worldwide monthly microprocessor shipments. But
> Intel doesn't give the cash back to the PC makers to use as they wish;
> instead, it deposits the money into an Intel-managed market
> development fund, or MEW, which the vendors must use to pay for
> print, Web, broadcast or radio advertising of their Intel-based systems.
> If they don't use the funding within 12 months, they lose it. . . .

-16-

> If a vendor strays from Intel's guidelines — even for an infraction as minor as using the wrong size Intel logo on theft packaging— Intel can freeze its eligible marketing fluids. Since the funds come from the PC companies' chip payments, many customers believe Intel artificially inflates processor pricing to cover the costs. "They already have your extra money," said a veteran executive who retired last year from a top PC company. "They're charging you more money and then giving it back to you so you can advertise their products.". . .

> In addition to its impact on pricing, the Intel Inside program also affects PC makers' product decisions. Although the guidelines don't prohibit use of non-Intel chips, they provide strong monetary disincentives to do so, several OEMs said. How strong? A licensee forfeits all MDF funding for a brand if it adds a non-Intel chip to the line. If it wishes to use another vendor's processor, it must establish an entirely new brand or sub-brand for that chip to retain funding for the existing brand. "There is no doubt that it's one of the major factors that influence [product] decisions," said a 20-year IBM PC executive who left the company in 1997. The source spoke from experience. In1995, he said, IBM built several prototypes of low-cost retail and small-office PCs based on Cyrix processors. But executives scrapped the plans, in part because they couldn't leave what the source described as a "substantial" amount of advertising money on the table. The branding restrictions go a long way toward explaining why none of the top 10 PC makers uses non-Intel chips in its business desktop lines.

48.      In addition, Intel has imposed on OEMs a system of first-dollar rebates that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements and artificially foreclosing AMD from competing for a meaningful share of the market. In order to qualify for a rebate on any of its purchases, an OEM must first achieve a target level of purchases set by Intel. Only upon an OEM's reaching this target will Intel retroactively provide a rebate. Intel intentionally sets a rebate trigger at a level of purchases it knows to constitute a dominant percentage of a customer's needs.

-17-

49.     Intel's rebate schemes are discriminatory and market-foreclosing. If a customer chooses to purchase any significant quantity of microprocessors from an Intel competitor such as AMD, it will not qualify for its rebate, and its price will be higher on all the Intel processors it buys across the board. By tailoring targets to each customer's size and anticipated volume, Intel locks up significant percentages of the market much more effectively and at a lesser cost to itself— but to a greater harm to AMD and ultimately consumers — as compared to offering such rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

50.     The use of retroactive rebates to limit AMD to a small share of an OEM's business heightens the obstacle to inducing the OEM to launch AMD-powered platforms. OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it. Intel's rebate and other business strategies effectively cap the volumes of AMD-powered products that an OEM can sell. Hence, Intel's practices exacerbate normal impediments to entry and expansion.

51.     Intel also uses product bundling in an exclusionary manner. For example, in bidding for a new OEM platform, Intel bundles microprocessors with free or heavily discounted chipsets or motherboards. Because ADM does not sell chipsets or motherboards, this product bundling enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality.

52.     The above anti-competitive practices are compounded by the potential for retaliatory threats. Intel has a variety of pressure points at its disposal: it can unilaterally reduce or withdraw a discount, rebate, or subsidy; it can impose a discriminatory price increase on a disfavored customer, extend a price cut to that customer's competitor, or force retailers into dropping the customer's

computers and buying from its competitor instead; or it can delay or dispute an allowance or rebate

— all of which can turn a profitable quarter for an OEM into an unprofitable one.

53.     Intel has the capability to use such threats not only to deter OEMs from purchasing

microprocessors from AMD, but also to undermine AMD product launches. For example, the April

25, 2003 issue of *The Inquirer,* a computer industry journal, reported that Intel used implicit threats

to keep vendors from attending AMD's launch of its Opteron chip:

> [The vendors] all told me that prior to the launch, they received a
> phone call from Intel. Intel asked if they were going to the launch. If
> they replied yes, the Intel rep asked them if it was 'important to them
> to go', or 'if they really wanted to go'.
>
> Pressing the vendors, I got the same response, 'Intel is too smart to
> threaten us directly, but it was quite clear from that phone call that we
> would be risking our various kickback money if we went'. If one
> vendor had said this to me, or even two, I would have put it down as
> little more than an annoyed vendor, but they all told me this. When
> asked for clarification, the stories sounded more and more alike, a
> pleasant sounding phone call from the Intel rep that made the hair on
> the back of their necks stand on end, and left no doubt in their minds
> as to what the 'request' actually was.
>
> Obviously, no one wanted to have their names in print as saying so,
> they were obviously scared to death. One vendor told me 'you need
> to sell Intel to survive you know'. Others named a vendor who did not
> show because of the pressure, and two or three said 'why do you think
> there are no motherboards here'? Underneath the happiness of the
> occasion, there was an undercurrent of uneasiness at best, and it was
> everywhere.

54.     In March 2005, the Japan Fair Trade Commission ("JFTC") found that Intel's wholly-

owned Japanese subsidiary, Intel Kabushiki Kaisha ("IJKK"), had violated Section 3 of Japan's

Antimonopoly Act, explaining as follows:

> IJKK, since May 2002, has made the five major Japanese OEMs

-19-

refrain from adopting competitors' CPUs for all or most of the PCs manufactured and sold by them or all of the PCs that belong to specific groups of PCs referred to as 'series', by making commitments to provide the five OEMs with rebates and/or certain fluids referred to as 'MDF' (Market Development Fund) in order to maximize their MSS [the proportion of Intel microprocessors incorporated into an OEM's computers], respectively, on condition that:

> (a) the Japanese OEMs make MSS at 100% and refrain from adopting competitors' CPUs;

> (b) the Japanese OEMs make MSS at 90%, and put the ratio of competitors' CPUs in the volume of CPUs to be incorporated into the PCs manufactured and sold by them down to 10%; or

> (c) the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into PCs in more than one series with comparatively large amount of production volume to others.

55.    As a result, according to the JFTC, "the ratio of the sales volume by AMD Japan and Transmeta USA among Total Domestic CPU Sales Volume decreased from approximately 24% in 2002 to approximately 11% in 2003. By means of such conducts, IJKK has substantially restrained the competition in the market of CPUs sold to the Japanese OEMs, by acting to exclude its competitors' business activities related to the sales of CPUs to the five OEMs." Intel has accepted the JFTC's recommendations and has chosen not to contest its conclusions.

### D.    Intel's Anti-competitive Practices Directed at Distributors

56.    Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic. For example, it entered into an exclusive deal with Synnex, which is one of the largest microprocessor distributors

in the United States. Given Intel's greater than 80 percent market share, there is no pro-competitive justification for this arrangement.

57. As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub- markets.

58. Intel also offers a panoply of special programs for distributors who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs.

59. Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much AMD business. But, unlike OEMs, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them. Intel does not share this information with distributors; they simply receive a check at the end of the quarter. As a result, every AMD chip that distributors purchase, they buy at their peril.

## E. Intel's Anti-competitive Practices Directed at Retailers

60. Approximately one-fifth of desktop and notebook computers is purchased at retail stores. A handful of retailers dominate the United States PC market: Best Buy and Circuit City are the largest, and other significant retailers are Wal-Mart, Staples, Office Depot, and Office Max.

61. Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar, and retailers refresh their inventory for each. A chipmaker faces

a two-step process to get its platform on retail shelves: first, it must convince one or more OEMs to build machines using its microprocessor at a suggested price (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines. In exchange for shelf space, the major retailers demand market development funds ("MDF"), which frequently entails a marketing- related opportunity that a chipmaker must buy for tens of thousands of dollars, such as space in a Sunday circular, an in-store display, or an internet training opportunity with the chain's sales staff.

62.     Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' "roadmaps" and the ability to exert pressure to keep AMD out of OEMs' product plans. Also, it has significantly greater financial resources with which to buy retail shelf space. To leverage those advantages, however, Intel also has made exclusive deals with many key retailers around the world.

63.     According to AMD, it has generally out-performed Intel on a shelf-space to sales basis. In the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33-38 percent share of Circuit City's sales, despite being limited to 5 of the 25 models (20 percent) on the Circuit City shelves. At Best Buy and Comp USA, with only approximately 15 percent of the shelf space, AMD computers account for roughly 30 percent and 22 percent of the stores' sales, respectively. These numbers confirm that AMD's products perform well at retail, provided that space is available.

64.     To further limit AMD's ability to compete, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers only if they agree to limit to 20 percent not just the shelf space devoted

-22-

to AMD-based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20 percent, the offending retailer's marketing support from Intel is cut by 33 percent across all products.

## F.    Intel's Anti-competitive Practices Involving Industry Standard-Setting and Other Technical Abuses

65.    Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are not only ubiquitous in the computer industry, they are essential. But when a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. It also has worked to deny AMD timely access to such standards. Its efforts have hindered AMD's ability to compete vigorously in the market.

66.    Although there exist industry organizations responsible for the standards governing computer memory chips, such as the Joint Electron Device Engineering Council ("JEDEC"), Intel has established secret committees, such as the Advanced DRAM Technology ("ADT") Consortium, in which it has disproportionate power, to develop competing standards. Such arrangements allow Intel to tighten its control over the industry by converting what component manufacturers intend as a public standard into a proprietary one, and to competitively disadvantage AMD by giving Intel a head start in completing designs that are in accord with new industry standards.

67.    Even where it has been unable to exclude AMD from participating in the development

-23-

of industry standards, Intel has attempted to drive the adoption of standards that have no substantial consumer benefit and the sole or dominant purpose of which was to competitively disadvantage AMD based on its highly integrated microprocessor architecture. For example, Intel proposed that JEDEC modify a proposed industry standard for dual inline memory modules ("DIMMs") in a way that had no technical merit but that, if adopted, would delay AMD's introduction of a technologically superior part.

68.    Intel also has designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires Intel to sacrifice its own product quality and integrity. For example, Intel has designed its compiler, which translates software programs into machine-readable language, to degrade performance when a program is run on an AMD platform. When software programs created with Intel's compiler detect an AMD microprocessor *(i.e.,* when the "CPUID," which identifies the microprocessor, is "AuthenticAMD"), they execute a code path that degrades the program's performance or causes it to crash.

69.    A June 2004 discussion that occurred in one of Intel's online forums illustrates the issue. A user wrote in to the forum to complain that "code compiled with the -xW flag now crashes on AMD Athlon chips. Looking at the code, it appears that the compiler now deliberately checks whether it's running on an Intel processor and if not disables SSE support, despite the fact that Athion MP and XP chips do SSE perfectly well." An Intel employee, "timl8," responded that the problem was "not deliberate, it's an oversight, due to AMD processors not being supported or tested with those options. . . . If it were deliberate, there would have been an explicit message displayed indicating non-support for your processor, rather than a crash with an unhandled CPUID result." The user disagreed:

-24-

No, the problem is deliberate. The older versions of IFC (version 7) produce code that works perfectly well on both Intel and AMD chips. The latest version does not. What is the difference? The new version, in the _Intel_cpu_-init internal function, checks the CPUID for the string "GenuineIntel". If that string is not present, the _intel_cpu_init function sets the CPU capability flags to zero, indicating that the processor doesn't support SSE2 or SSE or MMX or.... Hence if you have compiled code with —xK (which requires SSE support), it will crash on the Athion XP chip: the code checks whether the CPU supports SSE, incorrectly finds out that it doesn't and dies. The code will work fine if compiled with —axK (i.e. check if SSE is supported, and run generic i386 code if it isn't), but the SSE code will _only_ run on Intel chips and not on any others, even if the other chips are perfectly capable of handling SSE instructions. This isn't an Intel/AMD compatibility issue. This is a deliberate attempt by the compiler engineers to hobble the performance of IFC-produced code on non-Intel processors.

70.    The forum moderator subsequently wrote that, "[as Tim correctly pointed out, this was a bug introduced into the vector math library. It is fixed in the current 8.0 compilers. There are no plans to fix it for 7.1." In fact while the 8.0 version no longer has SSE ("Streaming SIMD Extensions") problems, it does still check the CPUID to determine whether the microprocessor is manufactured by Intel or AMD. Thus, the potential for similar abuses continues to exist even with the newer version of Intel's compiler.

71.    Because Intel's compiler is superior to compilers offered by third parties in terms of floating point or vectorized mathematical calculations, software programmers choose Intel's compiler for legitimate reasons. Unbeknownst to them, however, performance of their programs is degraded when run on an AMD microprocessor — not because of design deficiencies on the part of AMD, but rather due to Intel's anti-competitive behavior.

## VI. ANTITRUST INJURY

-25-

72.     Intel's exclusionary and restrictive practices described herein have suppressed competition in the relevant market and thereby have resulted in higher prices for Intel x86 microprocessors, even after accounting for any discounts or rebates attributable to microprocessor purchases. The overcharge imposed by Intel has been passed onto the Plaintiffs and other Class members in the form of higher prices for personal computers, workstations and servers containing Intel x86 microprocessors.

73.     Intel's supra-competitive prices are not the result of superior products or business acumen or competition on the merits. Instead, Intel has been able, at the financial expense of Class members, to artificially inflate prices for its products by engaging in a series of exclusionary acts and restrictive practices with the purpose and effect of restraining and preventing competition and unlawfully acquiring and maintaining its monopoly in the worldwide x86 Microprocessor Market.

## VII. CLAIMS FOR RELIEF

### COUNT I

### Monopolization & Violation of State Antitrust Statutes

74.     Plaintiffs repeat each of the foregoing allegations of this Complaint with the same force and effect as if fully set forth herein.

75.     Intel willfully maintained and unlawfully exercised monopoly power in the Class Jurisdictions and the market for microprocessors.

76.     Intel's conduct in maintaining and extending its monopoly power in the relevant market constitutes unlawful monopolization in violation of, without limitation:

Alabama:                 Ala. Code §§ 6-5-60 *et seq*

-26-

| Arizona: | Ariz. Rev. Stat. §§ 44-1401 *et seq*. |
| District of Columbia: | D.C. Code Ann ' 28-4501 |
| Hawaii: | Hawaii Rev. Stat. §§ 480-1 *et seq* |
| Iowa: | Iowa Code Ch. 553, §§ 553.1 *et seq* |
| Kansas: | Kan. Stat. Ann. §§ 50-101, *et seq.* |
| Maine: | Me. Rev. Stat. Ann. Tit. 10, §§ 1101, 1104 |
| Michigan: | Mich. Comp. Laws Ann. §§ 445.771 *et seq.* |
| Minnesota: | Minn. Code Ann. §§ 325D.49-325D.66 |
| Mississippi: | Miss. Code Ann. §§ 75-24-1 *et seq* |
| Nebraska: | Nebraska Rev. Stat. §§ 59-801 *et seq* |
| Nevada: | Nev. Rev. Stat. Chapter 598A |
| New Mexico: | N.M. Stat. Ann. §§ 57-1-3 |
| New York: | N.Y. Gen. Bus. Law §§ 340 |
| North Carolina: | N.C. Gen. Stat. §§ 75-1, 75-1.1, 75-2 |
| North Dakota: | N.D. Cent. Code §§ 51-08.1-08 |
| South Carolina: | S.C. Code Ann. §§ 39-3-10 |
| South Dakota: | S.D. Codified Laws Ann. §§ 37-1-14.3 and 37-1-33 |
| Tennessee: | Tenn. Code Ann. §§ 47-25-01 *et seq.* |
| West Virginia: | W. Va. Code §§ 47-18-9 |
| Wisconsin: | Wisc. Stat. Ann. §§ 133.03(1), 133.04, 133.16, 133.17 and 133.18 |

77.     Intel acted willfully to maintain and exercise monopoly power in the relevant market

through exclusionary, anti-competitive conduct as set forth above.

78.     There is no legitimate business justification for the actions and conduct through which Intel maintained its monopoly in the relevant market.

79.     Intel has effectively excluded competition from the relevant market, maintained its dominant market share in the relevant market, and profited by its anti-competitive conduct by excluding less expensive, superior competitive products, by maintaining prices at artificially high levels, and by reaping the benefits of its illegal monopoly.

80.     The anti-competitive effects of Intel's conduct far outweigh any conceivable pro-competitive benefits or justifications.

81.     Plaintiffs and Class members were injured in their business or property by Intel's monopolization of the relevant market. Without limiting the generality of the foregoing, Plaintiffs and Class members have been forced to pay higher prices for microprocessors, and products containing microprocessors in the relevant market than they would have paid in the absence of Intel's unlawful conduct.

## COUNT II

### Conspiracy to Violate State Statutes

82.     Plaintiffs repeat each of the foregoing allegations of this Complaint with the same force and effect as if fully set forth herein.

83.     Prior to and during the class period, Intel agreed, conspired and colluded with OEM.'s, and other various entities to assist Intel in: (a) excluding competition from other microprocessor manufacturers; and (b) willfully maintaining and unlawfully exercising monopoly power in the

relevant market. Such conduct constitutes an illegal conspiracy to monopolize in violation of, without limitation:

| | |
|---|---|
| Alabama: | Ala. Code §§ 6-5-60 *et seq* |
| Arizona: | Ariz. Rev. Stat. §§ 44-1401 *et seq*. |
| District of Columbia: | D.C. Code Ann ' 28-4501 |
| Hawaii: | Hawaii Rev. Stat. §§ 480-1 *et seq* |
| Iowa: | Iowa Code Ch. 553, §§ 553.1 *et seq* |
| Kansas: | Kan. Stat. Ann. §§ 50-101, *et seq.* |
| Maine: | Me. Rev. Stat. Ann. Tit. 10, §§ 1101, 1104 |
| Michigan: | Mich. Comp. Laws Ann. §§ 445.771 *et seq.* |
| Minnesota: | Minn. Code Ann. §§ 325D.49-325D.66 |
| Mississippi: | Miss. Code Ann. §§ 75-24-1 *et seq* |
| Nebraska: | Nebraska Rev. Stat. §§ 59-801 *et seq* |
| Nevada: | Nev. Rev. Stat. Chapter 598A |
| New Mexico: | N.M. Stat. Ann. §§ 57-1-3 |
| New York: | N.Y. Gen. Bus. Law §§ 340 |
| North Carolina: | N.C. Gen. Stat. §§ 75-1, 75-1.1, 75-2 |
| North Dakota: | N.D. Cent. Code §§ 51-08.1-08 |
| South Carolina: | S.C. Code Ann. §§ 39-3-10 |
| South Dakota: | S.D. Codified Laws Ann. §§ 37-1-14.3 and 37-1-33 |
| Tennessee: | Tenn. Code Ann. §§ 47-25-01 *et seq.* |
| West Virginia: | W. Va. Code §§ 47-18-9 |

-29-

Wisconsin:                    Wisc. Stat. Ann. §§ 133.03(1), 133.04, 133.16, 133.17 and

133.18

84.    There was no legitimate business justification for the agreement, collusion and
conspiracy between Intel and various other entities to help Intel in: (a) excluding competition from
other microprocessor manufacturers; and (b) willfully maintaining and unlawfully exercising
monopoly power in the relevant market.

85.    Intel's collusion, agreement and conspiracy alleged herein has enabled and assisted
Intel in: (a) effectively excluding less expensive, superior competitive products from the relevant
market; (b) maintaining Intel's dominant market share and monopoly power in the relevant market;
(c) maintaining prices at artificially high levels for Intel's microprocessors; and (d) otherwise reaping
the benefits of its illegal monopoly power.  The anti-competitive effects of Intel's collusive and
conspiratorial conduct far outweigh any conceivable pro-competitive benefits or justifications.

86.    Plaintiffs and the Class members were injured in their business or property by the
collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Intel's
exclusion of competition and monopolization of the relevant market.  Without limiting the generality
of the foregoing, Plaintiffs and Class members have been forced to pay higher prices for
microprocessors in the relevant markets than they would have paid in the absence of Intel's unlawful
conduct.

## COUNT III
### Violation of the Tennessee Consumer Protection Act
### and Other State Consumer Protection Statutes

87.    Plaintiffs repeat each of the foregoing allegations of this Complaint with the same

-30-

force and effect as if fully set forth therein.

88. Defendant is in the business of designing, producing, and selling microprocessors, and engage in trade, commerce, and consumer transactions as those terms are defined in the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-103.

89. Plaintiffs are consumers as that term is defined in the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-103.

90. The damages and losses sustained by Plaintiffs and Class members were caused by Defendant's violations of the Tennessee Consumer Protection Act.

91. At all relevant times, Defendant utilized deceptive representations, material non-disclosures, and misrepresented their conduct as being lawful, in order to encourage Plaintiffs and Class members to pay supra-competitive prices for microprocessors, and products containing microprocessors.

92. As a result of Defendant's violations of the Tennessee Consumer Protection Act, Plaintiffs and Class members suffered ascertainable losses, including the overcharges paid for artificially inflated prices of PCs containing Intel x86 microprocessors.

93. Upon information and belief, Defendants' methods of operation described in this Complaint are routine and uniform.

94. The foregoing conduct of Defendant is also in violation of the consumer protection and unfair or deceptive trade practices laws of the Class Jurisdictions, including the following statutes:

Alabama: Ala. Code §§ 8-18-1 *et seq.*

Arizona: Ariz. Rev. Stat. §§ 44-1401 *et seq.*

-31-

District of Columbia: D.C. Code Ann. §§ 28-3904

Florida:               Fla. Stat. §§ 501.201 *et seq.*; 542.18

Kansas:                Kan. Stat. Ann. §§ 50-626(b)

Maine:                 Me. Rev. Stat. Ann. Tit. 5, §§ 207, 209

Massachusetts:         Mass. Gen. Laws ch. 93A, §§ 9

Michigan:              Mich. Comp. Laws Ann. §§ 19.418(3) *et seq.*

Minnesota:             Minn. Code Ann. §§ 325D.43-48

Mississippi:           Miss. Code Ann. §§ 75-21-9

Nebraska:              Nebraska Rev. Stat. §§ 59-1601 *et seq*

Nevada:                Nev. Rev. Stat. Chapter 598A

New Mexico:            N.M. Stat. Ann. §§ 7-12-3

New York:              N.Y. Gen. Bus. Law §§ 349

North Dakota:          N.D. Cent. Code §§ 51-15-01 *et seq*

South Dakota:          S.D. Codified Laws Ann. §§ 37-26-6

Vermont:               9 Vermont Stat. Ann. §§ 2451-2480g

West Virginia:         W. Va. Code §§ 46A-6-104

Wisconsin:             Wisc. Stat. Ann. §§ 133.18


## COUNT IV
## Unjust Enrichment

95.     Plaintiffs repeat each of the foregoing allegations of this Complaint with the same

force and effect as if fully set forth herein.

-32-

96. As the result of Intel's illegal agreement, contract, combination and conspiracy, Plaintiffs and Class members conferred a benefit upon Intel, and Intel appreciated and accepted this benefit under such circumstances that it would be unjust and inequitable for them to retain it without paying its value to Plaintiff and the class members.

97. As a direct and proximate result of Intel's unjust enrichment, Plaintiffs and Class members suffered injury and seek an order directing Intel to return to them the pro-rata amount each of them improperly paid because of Intel's unlawful conduct as described in this Complaint, plus interest.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated in the Class Jurisdictions, request that they and the members of the Class have judgment entered in their favor and against Intel, as follows.

1. That summons be issued and that Intel be duly served with a copy of this Complaint and required to answer same, and that this Court decree and enter judgment.

2. That the Court certify the proposed class, designate Plaintiffs as class representatives, and designate Plaintiffs' counsel as class counsel.

3. That the Court award compensatory damages to Plaintiffs and the class members resulting from the various acts of wrongdoing under the common and statutory laws of the Class Jurisdictions, in such amounts as represent the losses reasonably suffered by Plaintiff and the class members.

4. That the Court decree that Intel violated the antitrust laws of the Class Jurisdictions and award Plaintiff and the class members appropriate relief.

-33-

5.    That the Court decree that the aforesaid unfair or deceptive acts or practices of

Defendant violated the Tennessee Consumer Protection Act of 1977, T.C.A. §47-18-101 et seq. and

the consumer protection and unfair or deceptive trade practices laws of the other Class Jurisdictions,

and award Plaintiffs and class members (i) actual damages in an amount to be proved at trial as a

result of the wrongful conduct alleged, plus interest and costs; and (ii) treble damages, where

appropriate, against Defendant for all losses and injuries suffered as a result of Defendant's illegal

actions, with the amount of damages (before trebling) to be determined at trial.

6.    That the Court decree that Intel has been unjustly enriched by their illegal, unfair or

deceptive acts and unfair competition and restraint of trade, and award restitution to Plaintiffs and

class members.

7.    That the Court award Plaintiffs their costs.

8.    That the Court order such other, further and general relief as is just and proper.

Respectfully submitted, this _____ day of August, 2005.

Gordon Ball
Ball & Scott
550 W. Main Ave., Suite 750
Knoxville, TN 37902
(865) 525-7028


Daniel K. Karon
Goldman, Scarlato & Karon PC
55 Public Square, Suite 1500
Cleveland, Ohio 44113

-34-

Tel:    (216) 622-1851
Fax:    (216) 622-1852


Krishna B. Narine
Law Office of Krishna B. Narine
7839 Montgomery Ave.
Elkins Park, PA 19027
Tel:    (215) 771-4988
Fax:    (215) 782-3241


Isaac L. Diel
Law office of Isaac L. Diel
135 Oak Street
Bonner Springs, Kansas 66012
Tel:    (913) 383-8711
Fax:    (913) 422-0307