## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | ) |
|  | ) |
| **INTEL CORP. MICROPROCESSOR** | ) |
| **ANTITRUST LITIGATION** | )    **MDL Docket No. 05-1717-JJF** |
|  | ) |
| This pleading relates to: | )    **Case No. 1:05-cv-00913-JJF** |
|  | ) |
| **ANDREW ARMBRISTER, MELISSA** | ) |
| **ARMBRISTER, and NANCY S. FRIEDMAN,** | ) |
| on behalf of themselves and all others | )    **Judge Farnan** |
| similarly situated v. INTEL CORPORATION, | ) |
|  | ) |
| Defendant. | ) |

## AMENDED CLASS-ACTION COMPLAINT

Plaintiffs and millions of other individuals and businesses similarly situated suffered injury from at least July 12, 2001 to present (the "Class Period") due to Intel's anti-competitive and monopolistic behavior, which substantially affected Tennessee commerce, as described below. Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated in Tennessee, Ohio, Illinois, Louisiana, Pennsylvania, Oklahoma, Oregon, Washington, Idaho, Montana, Nebraska, Utah, Colorado, Iowa, Texas, Arkansas, Missouri, Kentucky, Indiana, Alabama, Florida, Georgia, South Carolina, New York, Vermont, New Hampshire, Rhode Island, Massachusetts, Maryland, Virginia, Connecticut, Alaska, Hawaii, Wyoming, New Jersey, Nevada, and Delaware (the "Class Jurisdictions") for Intel's violations of the Tennessee Trade Practices Act, T.C.A. §47-25-101 *et seq*.

## I.   NATURE OF ACTION

1.     This action concerns Intel's anti-competitive and monopolistic practices intended to prevent and destroy competition and acquire and/or maintain monopoly power and raise prices to supra-competitive levels in the market for microprocessors that run the Microsoft Windows and Linux families of operating systems ("the x86 Microprocessor Market").

2.     Intel dominates the x86 Microprocessor Market, with greater than an 80% market share as measured by unit volume and greater than a 90% market share as measured by revenue. Intel acquired and maintains its monopolistic presence in the x86 Microprocessor Market through series of anti-competitive acts that were designed to, and did, eliminate competition and prevent entry in said market.

3.     Intel has used and continues to use its monopoly power to injure consumers by charging supra-competitive prices for its microprocessors.  These artificially inflated prices are passed on to consumers and end-users in the form of inflated personal computer prices and the loss of freedom to purchase computer products that best fit their needs.

4.     Intel's intentional stifling of a fair marketplace further reduces the pace and quality of innovation, which in turn negatively affects the economic and non-economic well being of those citizens in the Class Jurisdictions.

5.     Plaintiffs, on their own behalf, and on behalf of the Class defined below, seek to recover for the injuries resulting from their overpayments for Intel microprocessors.  Plaintiffs also seek injunctive and declaratory relief, and costs, including reasonable attorneys' fees.

6.      Plaintiffs bring this action on behalf of themselves and all others similarly situated in the Class Jurisdictions under the Tennessee Trade Practices Act because Intel's anti-competitive conduct and monopolization substantially affected Tennessee commerce.

## II.  PARTIES

7.      Plaintiffs Melissa and Andrew Armbrister are residents of Greeneville, Tennessee.  During the Class Period, they purchased two Dell computers that contained Intel microprocessors.

8.      Plaintiff Nancy S. Friedman is a resident of Cleveland, Ohio.  During the Class Period, she purchased a Dell computer that contained an Intel microprocessor.

9.      Defendant Intel Corporation is a Delaware corporation with its principal place of business in Santa Clara, California.  It conducts business both directly and through wholly owned and dominated subsidiaries worldwide.  Intel and its subsidiaries design, produce, and sell a wide variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries.

## III.   JURISDICTION AND VENUE

10.     This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. §1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs.  *See* 28 U.S.C. §1332.  This Court also has subject-matter jurisdiction because "one or more members of the class is a citizen

3

of a state within the United States and one or more of the Defendants is a citizen or subject of a foreign state." *Id.* The Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of the Court and Intel systematically and continually conducts business in this District.

11.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (c) because Intel as a corporation is "deemed to reside in any judicial district in which it is subject to personal jurisdiction."

### IV.  INTEL'S MONOPOLY POWER IN THE RELEVANT MARKET

*A.    The Relevant Product Market*

12.    The relevant product market is the x86 Microprocessor Market.

13.    A microprocessor, also called a microchip or chip, is an integrated circuit that contains the entire central processing unit for a computer. Original equipment manufacturers ("OEMs") use these microprocessors to power the computers that ultimately are purchased by consumers.

14.    Although other microprocessors, besides x86 microprocessors, are offered for sale, these other microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

15.    A putative monopolist in the x86 Microprocessor Market would be able to raise the prices of x86 microprocessors above a competitive level without losing so many customers to other microprocessors as to make this increase unprofitable.  While existing end-users can

4

theoretically shift to other operating system platforms, high switching costs associated with replacing existing hardware and software make this impractical.  Further, the number of new, first-time users who could choose a different operating system platform is too small to prevent an x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time.  Computer manufacturers would also encounter high switching costs in moving from x86 microprocessors to other architectures, and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

**B.    *The Relevant Geographic Market***

16.    The relevant geographic market is worldwide.  Indeed, in its July 1998 answer to a complaint by the Federal Trade Commission, Intel admitted that the relevant geographic market was the world.

17.    Intel and its competitors in the x86 Microprocessor Market compete globally. Platform architecture is the same from country to country; microprocessors can be easily and inexpensively shipped around the world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another.

**C.    *Intel's Monopoly Power in the Relevant Market***

18.    Intel dominates the worldwide x86 Microprocessor Market.  According to published reports, over the last several years it has consistently achieved more than a 90% market share as measured by revenue.  In seven of the last eight years, Intel has captured at least 80% of x86 microprocessor unit sales.

5

19.     Intel's only meaningful competitor in this market is Advanced Micro Devices, Inc. ("AMD"). AMD's revenue share has remained at approximately 9%, while its worldwide volume share has hovered around 15%, only once penetrating the 20% level.

20.     Another competitor, Cyrix, was acquired by National Semiconductor in 1997, and exited the market two years later. As of the beginning of 2005, only two other x86 chipmakers remained — Via Technologies, Inc. and Transmeta Corporation.  Transmeta has since announced its intention to cease selling x86 microprocessors, and Via has a less than 2% market share.

21.     Intel is shielded from new competition by huge barriers to entry.  A chip fabrication plant capable of efficiently mass-producing x86 microprocessors costs at least $2.5 billion.  In addition, billions of dollars in research and development costs would be required to design a competing x86 microprocessor and to overcome almost insurmountable intellectual property and knowledge barriers.

22.     Intel has reaped huge financial benefits from its monopoly position.  Intel's revenue from microprocessor sales alone exceeded $24 billion in 2004.  In 2003 and 2004, operating margins for the Intel Architecture business, which develops and sells microprocessors, were approximately 40%.

**D.     *Distribution in the Relevant Market***

23.     Annual worldwide consumption of x86 microprocessors currently stands at just over 200 million units per year and is expected to grow by 50% over the remainder of the decade. Relatively few microprocessors are sold for server and workstation applications (8.75 million in 2004), but these command the highest prices.  Most x86 microprocessors are used in desktop

personal computers ("PCs") and mobile PCs, with desktops currently outnumbering mobiles by a margin of three to one. Of the total worldwide production of computers powered by x86 microprocessors, 32% are sold to U.S. consumers.

24.    The majority of x86 microprocessors are sold to a handful of large OEMs, highly visible companies recognized throughout the world as the leading computer makers. Nine OEMs — regarded in the industry as "Tier One"— together account for almost 80% of servers and workstations, over 40% of desktop PCs, and over 80% of mobile PCs. These "Tier One" OEMs are Hewlett-Packard, which now also owns Compaq Computer; Dell; IBM, which sold its PC business to Lenovo as of May 1,2005; Gateway/eMachines; and Fujitsu/Fujitsu Siemens. Toshiba, Acer, NEC, and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market. The Tier One OEMs operate on small or negative profit margins.

25.    The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers, and other, smaller distributors.

26.    OEMs sell computers through a variety of distribution channels, including through the internet, company-employed sales staffs, independent distributors, and retail chains. Microprocessor manufacturers compete not only to have OEMs incorporate their products into their retail platforms but also to convince retailers to allocate shelf space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

## V.  INTEL'S UNLAWFUL ANTI-COMPETITIVE ACTIVITIES

### A.    *Intel's Acquisition of Monopoly Power*

27.    In the early 1980s, IBM defined the original PC standards, choosing among a variety of microprocessors, including those developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel, and ADM.  IBM opted for the Intel architecture, which utilized what became known as the x86 instruction set (after Intel's naming convention for its processors, *i.e.,* 8086, 80186, 80286, 80386, etc.).  IBM demanded, however, that Intel contract with another integrated circuit company and license it to manufacture 8086 chips as a second source.  ADM agreed to abandon its own, competing architecture, and undertook to manufacture 8086 chips as a second source of supply.

28.    In February 1982, Intel and AMD entered into a ten-year agreement by which either company could elect to be a second source for products offered to it by the other.  Under the contract, AMD could initially obtain second-source rights to Intel's 8086 chip and other specified products for cash; after 1985, AMD would have open access to Intel's product line if Intel accepted AMD products of sufficient value.  AMD served as a second source to the successors to the 8086 chip: the 80186 and 80286.

29.    Beginning in mid-1984, Intel, which was anxious to be the sole source for its upcoming 32-bit chip — the 80386 — decided to frustrate the operation of the contract by taking no more products from AMD.  Furthermore, Intel kept its decision secret from AMD and the public. As internal Intel documents state, Intel's objective was to "[a]ssure AMD they are our primary source through regular management conduct and formal meetings" in order to "[k]eep

8

AMD in the Intel camp." A 1986 Intel memorandum articulated its strategy: "Maintain a second-source, business as usual posture in the marketplace. . . . Our strategy is to keep talking. . . . We do not want [AMD] to go on to Hitachi or NEC, and should not stimulate them to do so."

30. Intel's plan succeeded. For about two years, AMD continued to believe, incorrectly, that it would be permitted to second-source the 80386 microprocessor. As an arbitrator later found, in a ruling that was confirmed by the California Supreme Court, "Intel to some extent lulled AMD into some sense of well-being about the continuation of the relationship and to some extent contributed to AMD's delay in reverse engineering the 80386."

**B.    Development of AME as a Threat to Intel's Monopoly**

31. Intel's conduct in the 1980s gave it a significant head start over AMD in the x86 Microprocessor Market. Not until June 1999 did AMD unveil its first x86 chip without Intel pin-compatibility, the Athlon microprocessor. Significantly, Athlon was the first x86 microprocessor to run at a speed of 1 GHz, and outperformed Intel's Pentium III chip in benchmark tests.

32. AMD's Athlon microprocessor consistently was recognized by the industry as a superior product. In 2000, Athlon captured the "triple crown" of computing accolades, winning the PC World Product of the Year award, the PC Magazine Technical Excellence prize for Best Component in Hardware Category, and the Maximum PC magazine CPU of the Year Award. By the end of 2001, Athlon had received more than 80 awards worldwide.

33.    In April 2003, AMD introduced the Opteron microprocessor, the world's first 64-bit x86 microprocessor for severs.   Several months later, ADM released the Athlon 64 microprocessor, its 64-bit x86 microprocessor for desktops and notebooks.   Importantly, and in contrast to Intel's Itanium microprocessor, AMD's new microprocessors were backward-compatible, meaning they could accommodate 32-bit software as well as 64-bit programs.

34.    In November 2003, PC Magazine awarded the Athlon 64 and Opteron microprocessors its Award for Technical Excellence in the components category.   The magazine wrote: "We tested the first 64-bit AMD Opteron processor in April 2003, and were we impressed! It screamed on our server application performance tests. Six months later, the Athlon 64 arrived, and again we were amazed by the processor's stellar performance in off-the-shelf 32-bit gaming, content creation, and business applications."   By the end of 2004, the Athlon 64 and Opteron microprocessors had won over 60 awards for innovation and performance.

35.    As Dell's CEO, Kevin Rollins, explained in February 2005, "When one of our partners slips on the economics or they slip in terms of the technology, that causes us great concern.  For a while Intel admittedly slipped technologically and AMD had stepped forward, and we were seeing that in terms of customer response and requests."

36.    Notwithstanding AMD's technical achievements and generally lower prices, Intel continues to dominate the x86 Microprocessor Market.   By means of Intel's anti-competitive conduct, AMD's market share has been constrained unlawfully. Among other things, this has prevented AMD from achieving minimum levels of efficient scale necessary to compete with

Intel as a predominant supplier to major customers. As a result, consumers of x86 microprocessors are forced to pay supra-competitive prices, are limited in their choice of products, and are denied the benefits of innovative developments.

37.     *Infoworld* magazine analyzed the competitive landscape in its August 27, 2004 issue:

> AMD has become known as the company that kept Intel honest, the Linux of the semiconductor world. Competition from AMD has reversed the trend of rising prices and stagnant innovation that characterize a controlled market. AMD is responsible for $500 desktops, $1,200 rack servers, and multigigahertz mainstream microprocessors, despite the fact that most of them have Intel's logo on them.
>
> Today, AMD's pluck is paying off bigger than ever before. After decades of aping Intel architectures, the AMD 64 architecture, rooted in Opteron and Athlon 64 processors, has actually been imitated by Intel in the form of Nocona, Intel's 64-bit version of Xeon. In a stunning reversal of fortune, Intel was forced to build that chip because Opteron was invading a server market that the Intel Itanium was supposed to dominate.
>
> Suddenly, Intel is feeling a breeze where its pants used to be. But with Intel mad as hell and hot on AMJYs heels, can AMD grab enough sales traction to hold up to the punishing onslaught everyone knows is coming?

38.     Rather than engage AMD in lawful competition, Intel has responded to AMD's threat to its monopoly position with a variety of anti-competitive practices directed at OEMs, distributors, and retailers, and involving industry standard-setting and other technical abuses. These anti-competitive practices are discussed below.

11

#### C.    *Intel's Anti-competitive Practices Directed at OEMs*

39.    At least in the short term, most if not all of the major OEMs must engage significantly with Intel for several reasons.  First, AMD is too small to service all of an OEM's needs while continuing to satisfy other customer demand.  Second, to meet customer expectations, OEMs must assure commercial computer buyers that specifications, including the microprocessor, will remain unchanged during the product's life-cycle.  Third, Intel has encouraged end-users to specify that microprocessors be of the same *family* among similar computers in one installation, as this is perceived to increase reliability (although technically this is not the case).  Intel has exploited OEMs' need to engage significantly with Intel by directing a series of anti-competitive practices at OEMs designed to limit AMD's growth.

40.    Through direct payments and other financial inducements, Intel has forced OEMs into exclusive and near-exclusive deals, thereby limiting AMD's ability to gain incremental market share. In addition, Intel has bought limited exclusivity from OEMs in order to exclude AMD from the most profitable lines or from channels of distribution best tailored to take advantage of AMD's price/performance advantage over Intel.  For example, Intel has largely foreclosed AMD from the lucrative commercial desktop sector.

41.    An April *5, 1999* article in *PC Week* described the coercive effect of one such form of payment, the "Intel Inside" program:

> The wildly successful program, which began broadly in1994 as a way to create brand equity for the Pentium processor, has evolved into Intel's premier marketing vehicle, managed by an army of attorneys, accountants and administrators.  Intel has deftly used the program to keep competitors at bay in the most profitable segment of its business: corporate PCs.  That in turn, has left computer

buyers with fewer options — and higher prices — when choosing business desktops, notebooks and PC servers.  A look at the Intel Inside program requirements, which Intel keeps under tight wraps, shows how fully the chip maker controls the marketing purse strings of PC makers that sign on. Interviews with numerous current and former executives at Intel's largest OEM customers — all of whom declined to be identified, fearing reprisals from Intel — add fuel to the fire.  These executives call the program addictive and claim their companies can't compete without it. . . .

The marketing dollars are enough of a carrot to make PC vendors sign off on Intel's restrictive program requirements.  Before PC makers are eligible for reimbursement they must sign an OEM Trademark License Agreement that regulates everything from logo size and color to branding.  The eligible systems are added to a form called Attachment C, which Intel uses to keep track of qualifying Intel Inside products. OEMs must modify Attachment C every time they introduce a new Intel-based system.  Once a PC maker meets all Attachment C guidelines, Intel reimburses 6% of the total average selling price of each vendor's worldwide monthly microprocessor shipments.  But Intel doesn't give the cash back to the PC makers to use as they wish; instead, it deposits the money into an Intel-managed market development fund, or MEW, which the vendors must use to pay for print, Web, broadcast or radio advertising of their Intel-based systems. If they don't use the funding within 12 months, they lose it. . . .

If a vendor strays from Intel's guidelines — even for an infraction as minor as using the wrong size Intel logo on theft packaging— Intel can freeze its eligible marketing fluids.  Since the funds come from the PC companies' chip payments, many customers believe Intel artificially inflates processor pricing to cover the costs.  "They already have your extra money," said a veteran executive who retired last year from a top PC company.  "They're charging you more money and then giving it back to you so you can advertise their products."

In addition to its impact on pricing, the Intel Inside program also affects PC makers' product decisions.  Although the guidelines don't prohibit use of non-Intel chips, they provide strong monetary disincentives to do so, several OEMs said.  How strong?  A licensee forfeits all MDF funding for a brand if it adds a non-Intel chip to

the line.  If it wishes to use another vendor's processor, it must
establish an entirely new brand or sub-brand for that chip to retain
funding for the existing brand.  "There is no doubt that it's one of
the major factors that influence [product] decisions," said a 20-year
IBM PC executive who left the company in 1997.  The source
spoke from experience.   In1995, he said, IBM built several
prototypes of low-cost retail and small-office PCs based on Cyrix
processors.  But executives scrapped the plans, in part because they
couldn't leave what the source described as a "substantial" amount
of advertising money on the table.  The branding restrictions go a
long way toward explaining why none of the top 10 PC makers uses
non-Intel chips in its business desktop lines.

42.    In addition, Intel has imposed on OEMs a system of first-dollar rebates that have

the practical and intended effect of creating exclusive or near-exclusive dealing arrangements and

artificially foreclosing AMD from competing for a meaningful share of the market.  In order to

qualify for a rebate on any of its purchases, an OEM must first achieve a target level of purchases

set by Intel.  Only upon an OEM's reaching this target will Intel retroactively provide a rebate.

Intel intentionally sets a rebate trigger at a level of purchases it knows to constitute a dominant

percentage of a customer's needs.

43.    Intel's rebate schemes are discriminatory and market-foreclosing.  If a customer

chooses to purchase any significant quantity of microprocessors from an Intel competitor such as

AMD, it will not qualify for its rebate, and its price will be higher on all the Intel processors it

buys across the board.  By tailoring targets to each customer's size and anticipated volume, Intel

locks up significant percentages of the market much more effectively and at a lesser cost to

itself— but to a greater harm to AMD and ultimately consumers — as compared to offering such

rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

14

44.    The use of retroactive rebates to limit AMD to a small share of an OEM's business heightens the obstacle to inducing the OEM to launch AMD-powered platforms.  OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it.  Intel's rebate and other business strategies effectively cap the volumes of AMD-powered products that an OEM can sell. Hence, Intel's practices exacerbate normal impediments to entry and expansion.

45.    Intel also uses product bundling in an exclusionary manner.  For example, in bidding for a new OEM platform, Intel bundles microprocessors with free or heavily discounted chipsets or motherboards.  Because ADM does not sell chipsets or motherboards, this product bundling enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality.

46.    The above anti-competitive practices are compounded by the potential for retaliatory threats.  Intel has a variety of pressure points at its disposal: it can unilaterally reduce or withdraw a discount, rebate, or subsidy; it can impose a discriminatory price increase on a disfavored customer, extend a price cut to that customer's competitor, or force retailers into dropping the customer's computers and buying from its competitor instead; or it can delay or dispute an allowance or rebate — all of which can turn a profitable quarter for an OEM into an unprofitable one.

47.    Intel has the capability to use such threats not only to deter OEMs from purchasing microprocessors from AMD, but also to undermine AMD product launches.  For example, the April 25, 2003 issue of *The Inquirer,* a computer industry journal, reported that Intel used implicit

15

threats to keep vendors from attending AMD's launch of its Opteron chip:

> [The vendors] all told me that prior to the launch, they received a phone call from Intel. Intel asked if they were going to the launch. If they replied yes, the Intel rep asked them if it was 'important to them to go', or 'if they really wanted to go'.

> Pressing the vendors, I got the same response, 'Intel is too smart to threaten us directly, but it was quite clear from that phone call that we would be risking our various kickback money if we went'. If one vendor had said this to me, or even two, I would have put it down as little more than an annoyed vendor, but they all told me this. When asked for clarification, the stories sounded more and more alike, a pleasant sounding phone call from the Intel rep that made the hair on the back of their necks stand on end, and left no doubt in their minds as to what the 'request' actually was.

> Obviously, no one wanted to have their names in print as saying so, they were obviously scared to death. One vendor told me 'you need to sell Intel to survive you know'. Others named a vendor who did not show because of the pressure, and two or three said 'why do you think there are no motherboards here'? Underneath the happiness of the occasion, there was an undercurrent of uneasiness at best, and it was everywhere.

48.    In March 2005, the Japan Fair Trade Commission ("JFTC") found that Intel's wholly-owned Japanese subsidiary, Intel Kabushiki Kaisha ("IJKK"), had violated Section 3 of Japan's Antimonopoly Act, explaining as follows:

> IJKK, since May 2002, has made the five major Japanese OEMs refrain from adopting competitors' CPUs for all or most of the PCs manufactured and sold by them or all of the PCs that belong to specific groups of PCs referred to as 'series', by making commitments to provide the five OEMs with rebates and/or certain fluids referred to as 'MDF' (Market Development Fund) in order to maximize their MSS [the proportion of Intel microprocessors incorporated into an OEM's computers], respectively, on condition that:

(a) the Japanese OEMs make MSS at 100% and refrain from adopting competitors' CPUs;

(b) the Japanese OEMs make MSS at 90%, and put the ratio of competitors' CPUs in the volume of CPUs to be incorporated into the PCs manufactured and sold by them down to 10%; or

(c) the Japanese OEMs refrain from adopting competitors' CPUs to be incorporated into PCs in more than one series with comparatively large amount of production volume to others.

49.    As a result, according to the JFTC, "the ratio of the sales volume by AMD Japan and Transmeta USA among Total Domestic CPU Sales Volume decreased from approximately 24% in 2002 to approximately 11% in 2003. By means of such conducts, IJKK has substantially restrained the competition in the market of CPUs sold to the Japanese OEMs, by acting to exclude its competitors' business activities related to the sales of CPUs to the five OEMs." Intel has accepted the JFTC's recommendations and has chosen not to contest its conclusions.

**D.    *Intel's Anti-competitive Practices Directed at Distributors***

50.    Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic. For example, it entered into an exclusive deal with Synnex, which is one of the largest microprocessor distributors in the United States. Given Intel's greater than 80% market share, there is no pro-competitive justification for this arrangement.

51.    As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub- markets.

52.    Intel also offers a panoply of special programs for distributors who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs.

53.    Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much AMD business. But, unlike OEMs, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them. Intel does not share this information with distributors; they simply receive a check at the end of the quarter. As a result, every AMD chip that distributors purchase, they buy at their peril.

E.    *Intel's Anti-competitive Practices Directed at Retailers*

54.    Approximately one-fifth of desktop and notebook computers are purchased at retail stores. A handful of retailers dominate the U.S. PC market: Best Buy and Circuit City are the largest, and other significant retailers are Wal-Mart, Staples, Office Depot, and Office Max.

55.    Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar, and retailers refresh their inventory for each. A chipmaker faces a two-step process to get its platform on retail shelves: first, it must convince one or more OEMs to build machines using its microprocessor at a suggested price (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines. In exchange for shelf space, the major retailers demand market development funds ("MDF"), which frequently entails a marketing- related opportunity that a chipmaker must buy

for tens of thousands of dollars, such as space in a Sunday circular, an in-store display, or an internet training opportunity with the chain's sales staff.

56.     Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' "roadmaps" and the ability to exert pressure to keep AMD out of OEMs' product plans. Also, it has significantly greater financial resources with which to buy retail shelf space. To leverage those advantages, however, Intel also has made exclusive deals with many key retailers around the world.

57.     According to AMD, it has generally out-performed Intel on a shelf-space to sales basis. In the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33-38% share of Circuit City's sales, despite being limited to 5 of the 25 models (20%) on the Circuit City shelves. At Best Buy and Comp USA, with only approximately 15% of the shelf space, AMD computers account for roughly 30% and 22% of the stores' sales, respectively. These numbers confirm that AMD's products perform well at retail, provided that space is available.

58.     To further limit AMD's ability to compete, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers only if they agree to limit to 20% not just the shelf space devoted to AMD-based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% across all products.

**F.    *Intel's Anti-competitive Practices Involving Industry Standard-Setting and Other Technical Abuses***

59.    Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are not only ubiquitous in the computer industry, they are essential. But when a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. It also has worked to deny AMD timely access to such standards. Its efforts have hindered AMD's ability to compete vigorously in the market.

60.    Although there exist industry organizations responsible for the standards governing computer memory chips, such as the Joint Electron Device Engineering Council ("JEDEC"), Intel has established secret committees, such as the Advanced DRAM Technology ("ADT") Consortium, in which it has disproportionate power, to develop competing standards. Such arrangements allow Intel to tighten its control over the industry by converting what component manufacturers intend as a public standard into a proprietary one, and to competitively disadvantage AMD by giving Intel a head start in completing designs that are in accord with new industry standards.

61.    Even where it has been unable to exclude AMD from participating in the development of industry standards, Intel has attempted to drive the adoption of standards that have no substantial consumer benefit and the sole or dominant purpose of which was to

competitively disadvantage AMD based on its highly integrated microprocessor architecture. For example, Intel proposed that JEDEC modify a proposed industry standard for dual inline memory modules ("DIMMs") in a way that had no technical merit but that, if adopted, would delay AMD's introduction of a technologically superior part.

62.     Intel also has designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires Intel to sacrifice its own product quality and integrity. For example, Intel has designed its compiler, which translates software programs into machine-readable language, to degrade performance when a program is run on an AMD platform. When software programs created with Intel's compiler detect an AMD microprocessor (*i.e.*, when the "CPUID," which identifies the microprocessor, is "AuthenticAMD"), they execute a code path that degrades the program's performance or causes it to crash.

63.     A June 2004 discussion that occurred in one of Intel's online forums illustrates the issue. A user wrote in to the forum to complain that "code compiled with the -xW flag now crashes on AMD Athlon chips. Looking at the code, it appears that the compiler now deliberately checks whether it's running on an Intel processor and if not disables SSE support, despite the fact that Athlon MP and XP chips do SSE perfectly well." An Intel employee, "timl8," responded that the problem was "not deliberate, it's an oversight, due to AMD processors not being supported or tested with those options. . . . If it were deliberate, there would have been an explicit message displayed indicating non-support for your processor, rather than a crash with an unhandled CPUID result." The user disagreed:

No, the problem is deliberate. The older versions of IFC (version 7) produce code that works perfectly well on both Intel and AMD chips. The latest version does not. What is the difference? The new version, in the Intel_cpu_-init internal function, checks the CPUID for the string "GenuineIntel". If that string is not present, the _intel_cpu_init function sets the CPU capability flags to zero, indicating that the processor doesn't support SSE2 or SSE or MMX or. . . . Hence if you have compiled code with —xK (which requires SSE support), it will crash on the Athion XP chip: the code checks whether the CPU supports SSE, incorrectly finds out that it doesn't and dies. The code will work fine if compiled with —axK (i.e. check if' SSE is supported, and run generic i386 code if it isn't), but the SSE code will _only_ run on Intel chips and not on any others, even if the other chips are perfectly capable of handling SSE instructions. This isn't an Intel/AMD compatibility issue. This is a deliberate attempt by the compiler engineers to hobble the performance of IFC-produced code on non-Intel processors.

64.    The forum moderator subsequently wrote that, "[as Tim correctly pointed out, this was a bug introduced into the vector math library. It is fixed in the current 8.0 compilers. There are no plans to fix it for 7.1." In fact while the 8.0 version no longer has SSE ("Streaming SIMD Extensions") problems, it does still check the CPUID to determine whether the microprocessor is manufactured by Intel or AMD. Thus, the potential for similar abuses continues to exist even with the newer version of Intel's compiler.

65.    Because Intel's compiler is superior to compilers offered by third parties in terms of floating point or vectorized mathematical calculations, software programmers choose Intel's compiler for legitimate reasons. Unbeknownst to them, however, performance of their programs is degraded when run on an AMD microprocessor — not because of design deficiencies on the part of AMD, but rather due to Intel's anti-competitive behavior.

## VI.  ANTITRUST INJURY

66.    Intel's exclusionary and restrictive practices described herein have suppressed competition in the relevant market and thereby have resulted in higher prices for Intel x86 microprocessors, even after accounting for any discounts or rebates attributable to microprocessor purchases.  The overcharge imposed by Intel has been passed onto the Plaintiffs and other class members in the form of higher prices for personal computers, workstations and servers containing Intel x86 microprocessors.

67.    Intel's supra-competitive prices are not the result of superior products or business acumen or competition on the merits.  Instead, Intel has been able, at the financial expense of Class members, to artificially inflate prices for its products by engaging in a series of exclusionary acts and restrictive practices with the purpose and effect of restraining and preventing competition and unlawfully acquiring and maintaining its monopoly in the worldwide x86 Microprocessor Market.

## VII.  THE MONOPOLY'S "SUBSTANTIAL EFFECT" ON  TENNESSEE COMMERCE

68.    Tennessee law permits any person injured indirectly, like the Plaintiffs and class members, to seek redress for their injuries arising out of illegal monopolies:

> All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

23

T.C.A. §47-25-101.

69.    With respect to who has standing to sue for a TTPA monopoly violation, the
TTPA provides that:

> Any person who is injured or damaged by any such arrangement, contract,
> agreement, trust, or combination described in this part may sue for and
> recover, in any court of competent jurisdiction, from any person operating
> such trust or combination the full consideration or sum paid by the person
> for any goods, wares, merchandise, or articles, the sale of which is
> controlled by such combination or trust.

*Id.* at. §47-25-106.

70.    In *Freeman Indus., LLC v. Eastman Chemical Co.*, No. E2003-00527-SC-S09-CV,
2005 Tenn. LEXIS 668 (Aug. 25, 2005), the Tennessee Supreme Court ruled that the TTPA was
triggered not by anti-competitive conduct but by "the effect of the anti-competitive conduct."
The Supreme Court also held that the TTPA's applicability, whether invoked by Tennessee
residents *or non-residents*, should be judged by "whether the alleged anti-competitive conduct
affects Tennessee trade or commerce to a substantial degree."

71.    During the Class Period, Intel's monopolistic conduct substantially affected
Tennessee commerce and injured consumers in Tennessee.

72.    Due to Intel's monopolization, prices for products containing Intel
microprocessors increased illegally in Tennessee.

73.    During the Class Period, Intel's microprocessor prices didn't follow the laws of
supply and demand existing in competitive markets, including markets in Tennessee.

74.    Intel's monopolization of microprocessors used in computers sold in Tennessee
had the following substantial effects on Tennessee commerce:

(a)    The price of Intel microprocessors indirectly purchased by Tennesseans was fixed, raised, maintained, and stabilized at inflated, artificial and non-competitive levels;

(b)    Tennesseans lost profits and were deprived of free and open competition in the purchase of computers containing Intel microprocessors;

(c)    Competition in the sale of microprocessors was restrained in Tennessee; and

(d)    Tennesseans paid higher prices for products containing Intel microprocessors than they would have paid absent Intel's monopoly.

75.    During the Class Period, Tennesseans indirectly purchased millions of dollars of Intel's microprocessors in Tennessee. By reason of Intel's violations of the TTPA, Plaintiffs and the class members paid significantly more for products containing Intel microprocessors than they would have paid in the absence of Intel's monopoly, and, as a result, Plaintiffs and the class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

76.    Intel's monopoly further substantially affected Tennessee commerce because Intel, either directly or through its agents, engaged in the following activities in or affecting Tennessee:

(a)    Transacted Intel microprocessor business in Tennessee;

(b)    Contracted to supply or obtain goods or revenue related to Intel's microprocessors business in Tennessee;

(c)    Intentionally availed itself of the benefits of doing microprocessor business in Tennessee;

(d)    Produced, promoted, sold, marketed, and/or distributed microprocessors in Tennessee, thereby purposefully profiting from access to Tennessee's direct-purchaser and indirect-purchaser microprocessor markets;

(e)    Caused tortious damage in Tennessee by fixing microprocessor prices;

25

    (f)      Caused tortious damage in Tennessee by acts or omissions committed outside Tennessee by regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct within Tennessee; and/or deriving substantial revenue from goods used or consumed in Tennessee;

    (g)      Committed acts and omissions that Intel knew or should have known would cause damage (and, in fact, did cause damage) in Tennessee while regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct in Tennessee; and/or deriving substantial revenue from goods used in Tennessee.

77.    And during the Class Period, Intel's monopoly substantially affected Tennessee commerce in the following additional ways:

    a.    <u>The Monopoly's Substantial Effect on Tennesseans' Trade or Commerce</u>: Some monopolies only affect the commerce of a limited geographic region or a limited number of Tennessee residents. Intel's monopoly, however, was more far reaching – it substantially affected every person in Tennessee. Because Intel microprocessors are a component of all Tennesseans' computers, Intel microprocessors were purchased by practically every person in Tennessee, in all segments of society, and in all geographic regions. There could hardly be anti-competitive conduct with a more substantial effect on the commerce of Tennessee and Tennesseans than Intel's monopolistic conduct alleged here.

    b.    <u>The Substantial Monetary Effect on Tennessee Trade or Commerce</u>: Intel's monopoly lasted over 5 years and over that time it sold hundreds of millions of dollars microprocessors in the U.S. With an estimated overcharge of over 15% during that time, Intel illegally profited tens of millions of dollars or more from its monopoly. Since computers containing Intel microprocessors are purchased in relationship to a state's total population and Tennessee has 2% of the U.S. population, the monopoly's adverse effect on Tennessee commerce was at least multiple millions of dollars.

c.    <u>Substantially Harmful Effect on the Integrity of the Tennessee Market</u>:
The Tennessee market is vulnerable and can be manipulated by monopolies either from outside
Tennessee, inside Tennessee, or both.  Without enforcing Tennessee's antitrust law to its fullest
extent, as expressed by the Tennessee Supreme Court, companies that break the law will remain
unpunished, and they will remain able to pray upon Tennesseans without consequence.  The
Tennessee Supreme Court explained, "the purpose of the TTPA is to protect the state's trade and
commerce affected by anticompetitive conduct." *Freeman,* 2005 Tenn. LEXIS, at *23.  Intel has
shattered this very purpose by illegally and criminally victimizing the Tennessee market.  Thus,
every level of the Tennessee market's integrity has been compromised – from the manufacturer to
the middlemen, where applicable, to the consumer.

d.    <u>The Substantially Adverse Effect on Tennessee Commerce Was Critical to
the Monopoly's Success</u>:  Because Intel microprocessors are sold throughout the U.S., price
arbitrage between states would prevent this monopoly's effectiveness if it didn't affect every
state, including Tennessee.  Direct purchasers would buy cheaper Intel microprocessors and
consumers would buy cheaper computers containing Intel microprocessors in Tennessee and then
ship them to unaffected states.  Thus, to ensure its monopoly's effectiveness, Intel knew that
Tennessee commerce had to be, would be, and was substantially affected.

e.    <u>Length of Substantial Effect on Tennessee Commerce</u>.  Some monopolies
are short-lived.  This one lasted for over 5 years, during which time Intel profited from it thereby
permitting it to continue its victimization of Tennessee consumers and its monopoly's substantial
effect on Tennessee commerce.

27

## VIII.   CLASS-ACTION ALLEGATIONS

78.    Plaintiffs bring this action on behalf of itself and a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class:

> All people and businesses in Tennessee, Ohio, Illinois, Louisiana, Pennsylvania, Oklahoma, Oregon, Washington, Idaho, Montana, Nebraska, Utah, Colorado, Iowa, Texas, Arkansas, Missouri, Kentucky, Indiana, Alabama, Florida, Georgia, South Carolina, New York, Vermont, New Hampshire, Rhode Island, Massachusetts, Maryland, Virginia, Connecticut, Alaska, Hawaii, Wyoming, New Jersey, Nevada, and Delaware (the "Class Jurisdictions") who indirectly purchased Intel microprocessors, other than for resale, from July 12, 2001 to present.
>
> Excluded from the class are all governmental entities, Intel and its subsidiaries, affiliates, officers, and directors.

79.    Plaintiffs don't know the exact size of the class, since such information is in Intel's exclusive control.  But based on the nature of the trade and commerce involved, Plaintiffs believe that the class numbers in the millions and that the class members are geographically dispersed throughout the Class Jurisdictions.   Therefore, joinder of all class members would be impracticable, and class treatment is the superior method for the fair and efficient adjudication of this controversy.

80.    Common legal and factual questions exist, such as:

(a)    Whether Intel engaged in the conduct alleged;

(b)    Whether Intel's monopoly affected the prices of microprocessors marketed, distributed, and sold in Tennessee and Class Jurisdictions;

(c)    Whether Intel monopolized the market for microprocessors that were marketed, distributed, and sold in Tennessee and Class Jurisdictions;

(d)    The existence and duration of Intel's monopoly to control the prices of microprocessors marketed, distributed, and sold in Tennessee and Class Jurisdictions;

(e)     Whether Intel's monopoly pricing scheme was effective;

(f)     Whether Intel's conduct caused injury in fact to the business or property of Plaintiffs and the class members, and if so, the appropriate classwide measure of damages;

(g)     Whether the purpose and effect of the acts and omissions alleged was to monopolize the prices of Intel microprocessors marketed, distributed, and sold in Tennessee and Class;

(h)     Whether statutory authority exists for Intel's actions as alleged;

(i)     Whether Intel's monopoly substantially affected Tennessee commerce.

(j)     Whether Intel should be enjoined from further transactions of this nature.

81.     The aforementioned legal and factual questions predominate over any questions affecting only individual class members.

82.     Plaintiffs' claims are typical of other class members' claims because Plaintiffs' claims are typical of the class members' claims because Intel injured Plaintiffs and the class members in the same manner (*i.e.,* Plaintiffs and class members were forced to pay supra-competitive prices for computers and other products containing Intel microprocessors), and each consumer was injured through the uniform misrepresentations and omissions described and paid supra-competitive prices for computers and other products containing and/or using Intel microprocessors without being informed that they were paying illegal and improper prices. Accordingly, by proving their own claims, Plaintiffs will presumptively prove the claims of all class members.

83.     Plaintiffs will fairly and adequately protect the interests of the class in that Plaintiffs are typical Intel microprocessor purchasers, have no conflicts with any other class

members, and are represented by experienced and able antitrust class-action counsel. Plaintiffs'

interests are coincident with, and not antagonistic to, those of the class members.

84.    Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil

Procedure because a class action is the superior procedural vehicle for the fair and efficient

adjudication of the claims asserted given that:

> (a)    Common questions of law and fact overwhelmingly predominate over any individual questions that may arise and consequently, there would be enormous economies to the courts and to the parties in litigating the common issues on a classwide basis instead of on a repetitive individual basis;

> (b)    The size of each class member's individual damage claim is too small to make individual litigation an economically viable alternative, such that few class members have any interest in individually controlling the prosecution of separate actions;

> (c)    Class treatment is required for optimal deterrence and compensation and for limiting the court-awarded reasonable legal expenses incurred by class members;

> (d)    Despite the relatively small size of each individual class member's claim, the aggregate volume of these claims, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost effective basis, especially when compared with repetitive individual litigation; and no unusual difficulties are likely to be encountered in the management of this class action in that all questions of law or fact to be litigated at the liability phase are common to the class.

85.    Class certification is appropriate under Rule 23(b)(2) of the Federal Rules of Civil

Procedure because Intel has acted on grounds generally applicable to the class.

86.    Class certification is also appropriate pursuant to Rule 23(b)(1) of the Federal Rules of

Civil Procedure because prosecution of separate actions would create a risk of adjudication with

respect to individual class members which may, as a practical matter, be dispositive of the interests of

other members not parties to the adjudication or which may substantially impair or impede their ability to protect their interests. Moreover, separate actions prosecuted by individual class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant.

## IX. VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT, TENN. CODE ANN. §47-25-101 *et. seq.*

87.    Plaintiffs reallege the allegations set forth in paragraphs 1-87.

88.    Intel willfully maintained and unlawfully exercised monopoly power in the Class Jurisdictions and the market for microprocessors, which lessened full and free competition in violation of the TTPA.

89.    Intel acted willfully to maintain and exercise monopoly power in the relevant market through exclusionary, anti-competitive conduct as set forth above.

90.    There is no legitimate business justification for the actions and conduct through which Intel maintained its monopoly in the relevant market.

91.    Intel has effectively excluded competition from the relevant market, maintained its dominant market share in the relevant market, and profited by its anti-competitive conduct by excluding less expensive, superior competitive products, by maintaining prices at artificially high levels, and by reaping the benefits of its illegal monopoly.

92.    The anti-competitive effects of Intel's conduct far outweigh any conceivable pro-competitive benefits or justifications.

93.    In formulating and effectuating its microprocessor monopoly, Intel charged prices at certain levels and increased or maintained prices for Intel microprocessors sold in the U.S., including in Tennessee.

31

94.    Intel's monopoly had the following substantial effects on Tennessee commerce:

(a)    Microprocessor price competition was restrained, suppressed, and eliminated in Tennessee;

(b)    Microprocessor prices were raised, fixed, maintained, and stabilized at artificially high levels in Tennessee;

(c)    Plaintiffs and class members who indirectly purchased Intel Microprocessor were deprived of free and open market competition, including in Tennessee, and were injured; and

(d)    Plaintiffs and class members paid more than they otherwise would have for Intel Microprocessor that they purchased indirectly, including Intel microprocessors purchased in Tennessee.

95.    Intel's monopolization scheme was perpetrated against and substantially affected Tennessee commerce by having victimized Tennesseans and/or by having occurred in Tennessee. The results of Intel's actions occurring outside Tennessee also substantially affected Tennessee commerce by increasing the prices Tennesseans paid for products containing Intel's microprocessors. As the result of Intel's illegal actions' substantial effect on Tennessee commerce, both direct and indirect purchasers of Intel's microprocessors in Tennessee and the Class Jurisdictions have been injured.

96.    As a direct and proximate result of Intel's TTPA violations, Plaintiffs and the class members have suffered injuries and seek damages for having been forced to pay higher prices for microprocessors and products containing microprocessors in the relevant market than they would have paid in the absence of Intel's unlawful conduct and seek an amount necessary to restore them to the position they would have been in had Intel not violated the TTPA.

## X.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated in the Class Jurisdictions, request that they and the class members have judgment entered in their favor and against Intel, as follows.

1.    That summons be issued and that Intel be duly served with a copy of this Amended Complaint and required to answer it, and that this Court decree and enter judgment;

2.    That the Court certify the proposed class, designate Plaintiffs as class representatives, and designate Plaintiffs' counsel as class counsel;

3.    That the Court decree that Intel violated the TTPA and award Plaintiffs and the class members (i) actual damages in an amount to be proved at trial as a result of the wrongful conduct alleged, plus interest and costs; and (ii) treble damages against Intel

     for all losses and injuries suffered as a result of Intel's illegal actions, with the amount of damages (before trebling) to be determined at trial;

4.    That the Court award Plaintiffs their costs; and

5.    That the Court order such other, further and general relief as is just and proper.

Respectfully submitted, this 24th day of January, 2006.


   /s/ Gordon Ball
Gordon Ball
**BALL & SCOTT**
550 W. Main Ave., Suite 750
Knoxville, Tennessee  37902
Telephone:    (865) 525-7028
Facsimile:    (865) 525-4679

Daniel K. Karon
**GOLDMAN SCARLATO & KARON, P.C.**
55 Public Square, Suite 1500
Cleveland, Ohio 44113
Telephone:    (216) 622-1851
Facsimile:    (216) 622-1852

Krishna B. Narine
**LAW OFFICE OF KRISHNA B. NARINE**
7839 Montgomery Ave.
Elkins Park, PA 19027
Telephone:     (215) 771-4988
Facsimile:     (215) 782-3241

Isaac L. Diel
**LAW OFFICE OF ISAAC L. DIEL**
135 Oak Street
Bonner Springs, Kansas 66012
Telephone:     (913) 383-8711
Facsimile:     (913) 422-0307

***Attorneys for Plaintiffs and the Class***

**CERTIFICATE OF SERVICE**

I, Gordon Ball, do hereby certify that a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

This 24th day of January, 2006.

/s/            Gordon Ball
Gordon Ball

35